CONGREGATION LUBAVITCH and
Rabbi Sholom B. Kalmanson,
Plaintiffs–Appellees,

v.

CITY OF CINCINNATI,
Defendant–Appellant.

No. 90–4084.

United States Court of Appeals,
Sixth Circuit.

Submitted Dec. 12, 1990.

Decided Jan. 16, 1991.

Nathan Lewin, David G. Webbert, Niki Kuckes, David I. Gelfand, Bradford M. Berry, Miller, Cassidy, Larroca & Lewin, Washington, D.C., Norman L. Slutsky, Cincinnati, Ohio, for plaintiffs-appellees.

James F. McCarthy, III, City Solicitor's Office for the City of Cincinnati, Cincinnati, Ohio, for defendant-appellant.

Before GUY and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

I

BOGGS, Circuit Judge.

Before us is a motion by the City of Cincinnati to stay an injunction by the United States District Court for the Southern District of Ohio, Carl B. Rubin, District Judge, requiring the City to permit Congregation Lubavitch and Rabbi Sholom B. Kalmanson ("Lubavitch") to erect and keep lit a menorah in Fountain Square during the eight days of Chanukah. The series of events that led to the motion before us began on December 7, 1990, when Lubavitch filed a motion before the District Court for a preliminary injunction to require the City to permit Lubavitch to place and maintain the menorah during Chanukah. Prior to its motion for an injunction, Lubavitch had not requested a permit for the display from the City Council, as required by ordinance. The District Court granted Lubavitch's motion and issued an injunction against the City on December 11, 1990.

The City immediately filed with this court a motion to stay the injunction.

This is not the first time that Lubavitch and the City of Cincinnati have tangled over the issue of whether Lubavitch should be permitted to place and maintain a menorah in Fountain Square during Chanukah. In fact, in 1987 Lubavitch requested an injunction, similar to the one granted below, after its application for a permit was denied. The injunction was not granted. In 1988, another Lubavitch application to the City Council was formally denied, and in 1989, a third was informally denied.

The City Council, on November 7, authorized its own holiday display on Fountain Square. This display, entitled " 'Tis the Season," includes an ice rink, permanent evergreen trees, and other holiday decorations. The City contends that this display is entirely secular, and that all religious symbols are to be excluded from the Square during the holiday season.

We ruled earlier on another motion to stay a district court injunction regarding the placement of a menorah in a public forum. *Americans United for Separation of Church and State v. Grand Rapids*, 922 F.2d 303 (6th Cir.1990). We granted the stay motion in *Americans United*, but deny the motion for a stay here, because the circumstances in this case differ in substantial and important respects from those in *Americans United*.

In Grand Rapids, the City was willing to allow the menorah; in Cincinnati, the City is opposed to its placement.

In Grand Rapids, the district judge's injunction forbade the placement of a menorah that had been in place for a number of years during the holiday season. In Cincinnati, the judge's injunction required the placement of a menorah that had never before been placed in this location.

In Grand Rapids, the area where the Lubavitch group sought to place the menorah was a plaza area arguably of special significance and proximity to the City government. In Cincinnati, the Fountain

Square has no particular connection with any government buildings or functions.

In Grand Rapids, the Lubavitch group had sought a permit in a timely fashion in the past, and was intending to seek one again when the injunction intervened. In Cincinnati, although Lubavitch had some earlier contact with the City, it began the suit at almost the last minute, 3 p.m. on Friday. Chanukah was to start at 6 p.m. on the following Tuesday.

## II

■ These differences demonstrate that no facile agreement or distinctions may be drawn between this case and *Americans United.* We approach this motion with a clean slate before us, bounded only by the four factors that govern our judgment on motions for stays. These four factors, as we noted in *Americans United,* are: 1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; 2) whether the applicant will be irreparably injured without a stay; 3) whether issuance of the stay will substantially injure the other parties interested in the proceedings, and 4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987). We note that we are not reviewing the district judge's grant of the injunction, and are therefore not bound to defer to his judgment. We are, however, bound to accept the district court's factual findings unless we find them to be "clearly erroneous." Fed.R.Civ.P. 52(a). *See generally James River Flood Control Ass'n v. Watt,* 680 F.2d 543, 544 (8th Cir. 1982) (Rule 52(a) applied by appellate court when evaluating motions to stay district court injunction).

In evaluating the four *Hilton* factors, we conclude that either party will suffer an irreparable injury if we rule against it. If Lubavitch does indeed have the constitutional right to place religious symbols on Fountain Square, its right will be irretrievably lost if the stay is granted. On the other hand, the City contends that the district court's order makes it an unwilling accomplice to the expression of views or attitudes with which it does not wish to be associated. This association will also be complete and irreparable when the holiday season is over, long before final review on the merits can occur before our court. With respect to the fourth *Hilton* factor, we believe that, as in the *Americans United* case, the public interest lies in a correct application of the relation between the first amendment's guarantee of free speech and its bar to any law respecting the establishment of a religion.

Accordingly, as in the *Americans United* case, our decision must turn on the likelihood of success on the merits. In analyzing the merits, the correct issue is not that advanced by the City: Whether the City is required to allow activity of any sort on Fountain Square, without regulation. Rather, it is whether the City may exclude this particular activity from the Square on the basis of a policy opening the forum to all displays, except those explicitly religious.

## III

■ Cincinnati has been quite clear that it objects to the placement—for a moderate length of time, appropriate to its function—of any religious symbol. In other words, Cincinnati objects to the placement of religious symbols *qua* religious symbols on Fountain Square. Discrimination against religious speech as such is content-based, and unconstitutional unless the City meets the standards appropriate to such a restriction. *Widmar v. Vincent,* 454 U.S. 263, 269–70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). Nevertheless, under *Widmar,* the City could impose various reasonable time, place, and manner restrictions that discomfited particular claimants wishing to use the Square, so long as such restrictions did not discriminate against religious speech. *Id.* at 276, 102 S.Ct. at 278.

For example, if Cincinnati had a clear policy of prohibiting unattended displays or objects, and the policy was applied to banners, signs indicating the progress toward the goal of contributions to the United Way, or the like, the constitutional difficulties would be significantly lessened. *See*

*Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (upholding a park service regulation that prohibited sleeping in public parks even when such conduct constituted "expressive conduct protected to some extent by the First Amendment"); *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2750, 105 L.Ed.2d 661 (1989) (upholding a city ordinance requiring performers to use a city-provided sound technician and equipment in order to limit the volume of music at the Naumberg Acoustic Bandshell, located in Central Park, New York City).

There are other possible policies that would exclude the menorah that might well prevail, though the question of constitutionality would be closer. For example, the city arguably could ban the erection of any displays, or any displays taller than four feet. *See Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341, 343 (7th Cir.1990). (upholding a Chicago regulation entirely banning free-standing displays and limiting the use of hand-held symbols or distribution of leaflets to particular areas at O'Hare Airport). Or it could go to a system of exclusive use for a single group, by priority of application, (or by a random lottery or similarly fair system) so long as the procedure did not give too much discretion to administrative authorities. *See Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981) (noting that a system of allocating booths in a state fair on a "straightforward first-come, first-served" basis did not create "the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place and manner regulation ...". This would be especially true if the available space is small, or architecturally unitary. Even reserving the Square for exclusive use for the City's own purposes at particular times, such as its holiday displays, might pass constitutional muster.

However interesting such cases might be, and however sympathetic the City's arguments might be if they were so made, the city does not advance any of these possible restrictions in this case.

■ The City's argument is, to paraphrase the popular song, "We don't 'low no religion 'round here." The City candidly states in its stay application:

> The City has not and does not permit the erection of an unattended, semipermanent religious display on Fountain Square.

Defendant's Memorandum in Support of Motion for Stay ("Defendant's Memorandum") at 4.

> May the City be forced to tolerate a religious symbol for an extended period when it desires to avoid any religious entanglement?

*Id.* at 6.

> The City has not permitted Fountain Square to be used by any religious group to erect a semipermanent, unattended solitary religious display or symbol.

*Id.* at 7.

As Judge Rubin specifically found,

> Fountain Square is available for public expression of all forms of opinion, political, social and religious....

Findings of Fact, Opinion and Conclusions of Law ("Findings") at 2.

Hence, the property in question here is undoubtedly a public "forum." *Widmar*, 454 U.S. at 267–268, 102 S.Ct. at 273 ("Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups.").

The Supreme Court has repeatedly emphasized that regulation of communicative activity in areas that are traditional public forums or have been opened as public forums must be content-neutral. In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), the Court noted that "[t]he State may ... enforce regulations of the time, place, and manner of expression which are content-neutral...." We agree with Judge Rubin that Fountain Square probably is a traditional public forum. Nevertheless, even if a forum is not a traditional one, if the state has opened it even if only for a time, "as long

as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* at 46, 103 S.Ct. at 955. Similarly, in *Society for Krishna Consciousness*, 452 U.S. at 647–48, 101 S.Ct. at 2564, the Supreme Court stated that "[w]e have often approved restrictions [on time, place, and manner] provided that they are justified without reference to the content of the regulated speech...." (citations omitted). Regulations that exclude religious speech *per se* violate this principle and cannot be justified under applicable constitutional standards. *Widmar*, 454 U.S. at 277, 102 S.Ct. at 278.

■ The City also argues that it must bar particularly religious displays in order to avoid the appearance of endorsing religion. This argument is developed at length by the Second Circuit in *Kaplan v. City of Burlington*, 891 F.2d 1024 (2d Cir. 1989). In the *Americans United* case we stated that we did not believe that this was the law in our circuit. In any event, this case is distinguishable from *Kaplan.* In *Kaplan,* the religious display was located within 60 feet of City Hall, where the danger of a reasonable observer inferring an endorsement was at least plausible. *Id.* at 1024. Here, the menorah is located in Fountain Square, a facility that does not carry the same suggestion of imprimatur as a location near City Hall.

Cincinnati has attempted to justify its exclusion of religious displays by parading before the court horribles that could be deterred by a policy regulating all displays, including the menorah. There is not the slightest indication, however, that such a non-discriminatory policy has ever been adopted. As Judge Rubin wrote,

It is conceded by the city of Cincinnati that the Fountain Square is available for the expression of all shades of opinion and, indeed, such expression has been encouraged.

*Findings* at 5.

Cincinnati makes no representation that it has any rule against the general erection or maintenance of objects on Fountain Square. Plaintiffs assert, without contradiction on this point, that various large objects such as banners, flags and religious photographs have been displayed, some for extended periods of time.

■ In sum, the City has not made a strong showing that Judge Rubin was incorrect in concluding on the facts and arguments before him that

where a public square is maintained for the presentation of various forms of belief, social, political and religious, the municipality may not bar from that square a religious symbol which is an expression of first amendment free speech.

*Id.* at 7–8.

Cincinnati also relies on cases where content-neutral restrictions on erecting structures in public forums have been upheld. *See generally Lubavitch of Iowa v. Walters,* 873 F.2d 1161 (8th Cir.1989) (*"Iowa Lubavitch"*), and *Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341 (7th Cir.1990) (*"Chicago Lubavitch"*). In *Iowa Lubavitch,* the bar to the erection of a menorah during the eight days of Chanukah was a regulation reasonably interpreted as precluding demonstrators with permits from leaving any symbolic item, sign, banner or other freestanding object on the state capitol grounds after an event or between events scheduled on successive days. *Lubavitch of Iowa, Inc. v. Walters,* 684 F.Supp. 610, 611 (S.D.Iowa 1988) In *Chicago Lubavitch,* city regulations prohibited placing structures in public areas of O'Hare airport. 917 F.2d at 346. These regulations did not apply to religious displays only, nor did they refer to the expressive content of the displays in any way. As such, they were content-neutral and constitutionally acceptable under *Widmar.*

We are sympathetic with the dissent that the City has been left in a state of some uncertainty. The Lubavitch tactics in bringing the suit at this time and in this manner, without directly seeking a permit, even though they did discuss the matter with the City Council, would easily justify a denial of the request for the injunction, in our view. This was also the opinion of the late Judge Porter in 1987, who in 1987 under similar circumstances, denied Lubav-

itch the relief granted them this year. Nonetheless, the city has not made the strong showing that Judge Rubin's conclusions of law are erroneous, as *Hilton* requires.

Under these circumstances, we deny the City's motion. The requisites for the granting of a stay have not been met. This assessment is, of course, without prejudice to the ruling this court may ultimately make upon full briefing and the raising of any other possible arguments concerning the circumstances of the application or any content-neutral reasons for the City's actions.

This opinion is in further explication of our order issued December 14, denying a stay of the injunction ordered by Judge Rubin.

EDWARDS, Senior Circuit Judge, concurring.

The case presented to this court this Christmas holiday season posed the question of whether certain holiday customs violate the legal requirement that church and state be kept separate.

I expressed the views that this question should be faced squarely and that the placing of a Menorah and/or a Christmas tree in or on a public park or square in Cincinnati or any other city is not a violation of any legal or constitutional rule or requirement.

As to speculation about the use of public property by terrorist organizations, I would await the presentation of such an issue before this court.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

In dissenting, I do not fault the court's scholarship but, rather, part company with the majority on the issue of our proper role in considering an emergency stay motion. After disclaiming any intent to decide the merits of this case, the court, in my opinion, has done just that. In discussing the City's "likelihood of success on the merits," the court has gone far beyond what is necessary to decide this motion.

Unlike the majority, I believe the City has made the necessary showing on the merits when that prong of the four-factor emergency stay test is properly considered, as it must be, in conjunction with the other three factors. The City does not need to convince the court it is right. The City's argument that the "public forum" doctrine does not give members of the public an unfettered right to place tangible objects in a public square and leave them there unattended has merit. I disagree with the majority contention that the City has somehow limited itself to arguing only about the placement of a religious symbol. A religious symbol is what was involved, so that is what was discussed. But the legal principle invoked transcends any such limitation. This is not your typical "Christmas creche" case. The reliance by the district court on the "public forum" doctrine means that *any* group or individual can now claim the right to express any view protected by the first amendment, not just by making a speech or holding a demonstration, but by erecting some tangible symbol or placing some physical object in Fountain Square and leaving it there unattended. At a minimum, the City has made a "strong showing" that the law is less than fully developed on the specific point at issue here.

On the issue of irreparable injury, I come down on the side of the City. The plaintiff group has been trying for at least three years to erect a menorah in Fountain Square. Notwithstanding its knowledge that the City intended to deny permission, it waited to file suit until the time remaining became very short, resulting in the courts having to deal with these important and difficult issues in an unduly limited period of time. The only injury to be suffered by the plaintiffs is that, as in previous years, they will not be allowed to have a menorah in Fountain Square this year during the Chanukah holiday. The City, on the other hand, is left highly uncertain as to its continued ability to use its longstanding permit system to regulate use of a major public facility. Other groups may ask for the same emergency "display rights" afforded to the plaintiffs here. I can envision a chaotic situation arising, as

anyone from the "skin heads" to the Rosicrucians demand the right to erect their particular talisman in Fountain Square with or without the City's permission.

As I have intimated, I do not see the plaintiff group as being substantially injured by the issuance of a stay. I do not make light of the important free speech issues involved but, rather, suggest that a regular panel of this court will consider these questions and issue a definitive opinion that will provide guidance for the future, subject, of course, to further controlling pronouncements from the Supreme Court. There is no need for this panel to try to accomplish this difficult task in such a short period of time.

As for public interest, it lies in the courts striking a proper balance between the first amendment's guarantee of free speech and the City's right to assert reasonable control over publicly owned property. It is impossible to evaluate these issues properly against the backdrop of a truncated record and under the time constraints imposed in resolving an emergency motion.

Very recently, this same panel addressed a related issue in the case of *Americans United for Separation of Church and State v. City of Grand Rapids*, 922 F.2d 303 (6th Cir.1990). There, we stayed a district court order that had enjoined the City from allowing a menorah to be erected in a public square in Grand Rapids. Although there are factual similarities between the two cases, their differences are more significant than their similarities. In the Grand Rapids case, the City had allowed the menorah for the six previous years and had granted permission for its erection again this year. Thus, our stay in the Grand Rapids case preserved the historical status quo. I feel we should do the same here since this is an emergency motion.

Also in the Grand Rapids case, we made it clear that the effect of our stay was to allow the City to issue the permit, not require it to do so. The erection of structures in a public square against the wishes of a city has ramifications ranging from tort liability to possible breaches of the public peace. As I construe an emergency motion of this nature, the issue does not involve free speech or the establishment clause so much as it does who should control what structures can be erected in Fountain Square for the next three to four months while this court decides the case on the merits. I think that control should go to the entity that has the responsibility and the liability for what happens in Fountain Square in the interim.

I would grant the emergency stay motion.